## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### Atlanta Division

| | |
|---|---|
| MADELAINE MATTHEWS, *on behalf of herself and all others similarly situated,*<br><br>        Plaintiff,<br><br>    v.<br><br>EAGLE LENDING, LLC d/b/a FINEDAY FUNDS, WOLF RIVER DEVELOPMENT COMPANY, GENA KAKKAK, DANA WAUBANASCUM, SPENCER GAUTHIER, JOEY AWONOHOPAY, MYRNA WARRINGTON, DOUGLAS COX, RACHEL FERNANDEZ, DAYNELL GRIGNON, REBECCA BRUNETTE, CRYSTAL CHAPMAN-CHEVALIER, and JOHN DOES Nos. 1-15,<br><br>        Defendants. | Civil Action No. _____ |

## CLASS ACTION COMPLAINT

Plaintiff Madelaine Matthews, on behalf of herself and all others similarly situated, files this Class Action Complaint against the named Defendants and yet-to-be-identified coconspirators, John Does Nos. 1-15, whose identities have intentionally been concealed, and alleges as follows:

## INTRODUCTION

1.     Ms. Matthews is a Georgia consumer who received illegal, high-interest loans over the internet, supposedly made by an online lending company doing business as Fineday Funds, which holds itself out as a company owned and operated by a Native American tribe.  Ms. Matthews' loan from Fineday charged an Annual Percentage Rate of 617.862%, requiring her to repay more than $5,300 in finance charges in nine months on a $1,400 loan.  By comparison, Georgia's interest rate cap on small-dollar loans like Plaintiff's is only 8%, which is seventy-seven times lower than the rate charged to Plaintiff.

2.     Usury—the practice of lending money at unreasonably high rates of interest—"is an ancient crime by which the powerful exploit the most poor and desperate." *Dunn v. Glob. Tr. Mgmt., LLC*, 2020 WL 7260771 (M.D. Fla. Dec. 10, 2020).  And "[a]s ancient as the practice of usury and loansharking may be, equally old are circumvention schemes to avoid its prohibition."  *Id*.  This case involves one of those schemes, which is commonly referred to as a "tribal lending" business model, or more colloquially, as "rent-a-tribe," a "recent incarnation of payday lending companies regulation-avoidance."  Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 785 (2012).

2

3.   Non-tribal payday lenders and third-party funders wishing to use this model to circumvent state legal prohibitions on usurious lending go searching for a small, easily dominated tribe that will be willing to serve as the consumer-facing façade for the usury scheme, in return for receiving a small portion of the revenue generated (the "rent" referred to in the "rent-a-tribe" label) and, often, some call-center jobs.  The tribal entity playing this role serves as the nominal lender for the purpose of enabling the non-tribal actors running the operation to make the dubious and legally incorrect claims that (a) the loans are subject only to tribal law, not the protections created by state usury and licensing laws, and (b) that they themselves are somehow vicariously protected by the tribe's sovereign immunity.

4.   Federal law does not grant Native American tribes any special power to make loans over the internet to consumers across the United States in violation state usury restrictions.  On the contrary, it is well settled that "[a]bsent a federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State."  *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49 (1973).  Nonetheless, the tribal leaders and employees named as Defendants have deliberately chosen to enter and facilitate the loansharking enterprise described below.

5.     In this case, Eagle Lending, LLC d/b/a Fineday Funds ("Fineday") holds itself out as a tribal lending entity owned and operated by the Menominee Indian Tribe of Wisconsin ("Tribe" or "MITW").  Upon information and belief, Fineday is wholly owned and controlled by Wolf River Development Company ("Wolf River" or "WRDC").  According to its website, Wolf River's purpose is "to investigate, review, consider, pursue and conduct any nongaming commercial activity of the Menominee Indian Tribe of Wisconsin deemed advisable by the [Wolf River] Board of Directors in order to generate profit, whether on or off the Menominee Reservation."[1]

6.     Wolf River—and, in turn, Fineday—is controlled and directed by a Board of Directors, the membership of which is not publicly available but will be confirmed through discovery.  It is also led by its Chief Executive Officer, Defendant Crystal Chapman-Chevalier.

7.     Defendants Gena Kakkak, Dana Waubanascum, Spencer Gauthier, Joey Awonohopay, Myrna Warrington, Douglas Cox, Rachel Fernandez, Daynell Grignon, and Rebecca Brunette (collectively, the "Tribal Legislature Defendants") are members of the Tribe's Legislature.  The Tribe's Constitution established the Legislature as the governing body "vested with all executive and legislative powers

---

[1] https://www.wolfriverdevelopment.com/purpose/.

of the Tribe."  Exhibit 1 art. III § 1.  The Legislature also has the power to charter all enterprises of the Tribe, *id.* art. XII, and it "retain[s] all authority and power to exercise all proper governmental and sovereign functions over the tribal business[es] and over property managed and owned by the tribal business[es]," *id.* art. XIII § 1. The Tribe's Code further empower the Tribal Legislature Defendants to appoint and remove members of the Board of Directors for Wolf River.  Exhibit 2 § 740-6. Pursuant to the Tribe's Constitution and the laws of the Tribe, the Tribal Legislature Defendants direct, control, and oversee the economic affairs and enterprises of the Tribe, including Wolf River and Fineday.

8.     Defendants have actively participated in the scheme and have conspired with each other and others to repeatedly violate state lending statutes resulting in the collection of unlawful debt from Plaintiffs and the members of the class described below.

9.     Defendants and others not yet known to Plaintiff have been knowingly participating in the illegal lending enterprise, which has made and is making and has collected and is collecting on grossly usurious loans.  This lawsuit challenges the legality of Fineday's high-interest loans and seeks damages and declaratory relief against co-conspirators participating in this illegal scheme, including, most importantly, those whose identities have been deliberately concealed.   More

specifically, Plaintiff seeks relief under the Racketeer Influenced and Corrupt Organizations Act ("RICO"); the Georgia Racketeer Influenced and Corrupt Organizations Act ("Georgia RICO"); and Georgia's usury and licensing laws. Fineday and others have likely collected tens of millions of dollars on void loans and in violation of federal and state usury, licensing, and criminal statutes.

## JURISDICTION

10.     This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1965 and 28 U.S.C. §§ 1331 and 1332(d)(2).   Moreover, the Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

11.     Venue is proper in this Court pursuant to 18 U.S.C. § 1965(a) because Defendants have transacted their affairs in Georgia, including the making and collection of loans to likely thousands of borrowers in Georgia.   Additionally, venue is also proper in this Court pursuant to 28 U.S.C. § 1965(b) because Plaintiff is a resident of this Division and a substantial part of Plaintiff's claims occurred in Georgia and this District.

## PARTIES

12.     Plaintiff Madelaine Matthews is a natural person residing in Atlanta, Georgia.

13.    Eagle Lending, LLC d/b/a Fineday Funds holds itself out as an entity formed under the laws of the Tribe.

14.    Wolf River Development Company holds itself out as an entity formed under the laws of the Tribe.  Wolf River owns, controls, and operates Fineday Funds.

15.    Defendant Gena Kakkak is a natural person residing in Wisconsin.  She is the chairperson of the Tribe's Legislature.  Both as chairperson and a general member of the Legislature, Defendant Kakkak's duties include the chartering and oversight of Wolf River, Fineday, and the other lending operations under the Tribe's control, including, at a minimum, Five Clans Lending, LLC ("Five Clans"), and Four Directions Lending, LLC ("Four Directions") (collectively, including Wolf River and Fineday, the "MITW Lending Entities" and each a "MITW Lending Entity"). In performing these duties, Defendant Kakkak meets at least four times a year with other members of the Legislature to review, perform, and implement high-level management of the MITW Lending Entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the MITW Lending Entities; and approval of agreements between each entity and nontribal coconspirators.  Plaintiff seeks monetary damages against Defendant Kakkak only in her individual capacity, while seeking injunctive and declaratory relief against her in her official capacity as a Tribal Legislator.

7

16.    Defendant Dana Waubanascum is a natural person residing in Wisconsin.  She is the vice-chairperson of the Tribe's Legislature.  Both as an officer and a general member of the Legislature, Defendant Waubanascum's duties include the chartering and oversight of the MITW Lending Entities.  In performing these duties, Defendant Waubanascum meets at least four times a year with other members of the Legislature to review, perform, and implement high-level management of the MITW Lending Entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the MITW Lending Entities; and approval of agreements between each entity and nontribal coconspirators.  Plaintiff seeks monetary damages against Defendant Waubanascum only in her individual capacity, while seeking injunctive and declaratory relief against her in her official capacity as a Tribal Legislator.

17.    Defendant Spencer Gauthier is a natural person residing in Wisconsin. He is the secretary of the Tribe's Legislature.  Both as an officer and a general member of the Legislature, Defendant Gauthier's duties include the chartering and oversight of the MITW Lending Entities.  In performing these duties, Defendant Gauthier meets at least four times a year with other members of the Legislature to review, perform, and implement high-level management of the MITW Lending Entities, including but not limited to approval of the creation of each entity; the

8

appointment and removal of the board members of the MITW Lending Entities; and approval of agreements between each entity and nontribal coconspirators.  Plaintiff seeks monetary damages against Defendant Gauthier only in his individual capacity, while seeking injunctive and declaratory relief against him in his official capacity as a Tribal Legislator.

18.     Defendant Joey Awonohopay is a natural person residing in Wisconsin. He is a member of the Tribe's Legislature.  As a member of the Legislature, Defendant Awonohopay's duties include the chartering and oversight of the MITW Lending Entities.  In performing these duties, Defendant Awonohopay meets at least four times a year with other members of the Legislature to review, perform, and implement high-level management of the MITW Lending Entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the MITW Lending Entities; and approval of agreements between each entity and nontribal coconspirators.  Plaintiff seeks monetary damages against Defendant Awonohopay only in his individual capacity, while seeking injunctive and declaratory relief against him in his official capacity as a Tribal Legislator.

19.     Defendant Myrna Warrington is a natural person residing in Wisconsin. She is a member of the Tribe's Legislature.  As a member of the Legislature,

Defendant Warrington's duties include the chartering and oversight of the MITW Lending Entities.  In performing these duties, Defendant Warrington meets at least four times a year with other members of the Legislature to review, perform, and implement high-level management of the MITW Lending Entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the MITW Lending Entities; and approval of agreements between each entity and nontribal coconspirators.  Plaintiff seeks monetary damages against Defendant Warrington only in her individual capacity, while seeking injunctive and declaratory relief against her in her official capacity as a Tribal Legislator.

20.    Defendant Douglas Cox is a natural person residing in Wisconsin.  He is a member of the Tribe's Legislature.  As a member of the Legislature, Defendant Cox's duties include the chartering and oversight of the MITW Lending Entities.  In performing these duties, Defendant Cox meets at least four times a year with other members of the Legislature to review, perform, and implement high-level management of the MITW Lending Entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the MITW Lending Entities; and approval of agreements between each entity and nontribal coconspirators.  Plaintiff seeks monetary damages against Defendant Cox

only in his individual capacity, while seeking injunctive and declaratory relief against him in his official capacity as a Tribal Legislator.

21.   Defendant Rachel Fernandez is a natural person residing in Wisconsin. She is a member of the Tribe's Legislature.  As a member of the Legislature, Defendant Fernandez's duties include the chartering and oversight of the MITW Lending Entities.  In performing these duties, Defendant Fernandez meets at least four times a year with other members of the Legislature to review, perform, and implement high-level management of the MITW Lending Entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the MITW Lending Entities; and approval of agreements between each entity and nontribal coconspirators.  Plaintiff seeks monetary damages against Defendant Fernandez only in her individual capacity, while seeking injunctive and declaratory relief against her in her official capacity as a Tribal Legislator.

22.   Defendant Daynell Grignon is a natural person residing in Wisconsin. She is a member of the Tribe's Legislature.  As a member of the Legislature, Defendant Grignon's duties include the chartering and oversight of the MITW Lending Entities.  In performing these duties, Defendant Grignon meets at least four times a year with other members of the Legislature to review, perform, and

implement high-level management of the MITW Lending Entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the MITW Lending Entities; and approval of agreements between each entity and nontribal coconspirators.  Plaintiff seeks monetary damages against Defendant Grignon only in her individual capacity, while seeking injunctive and declaratory relief against her in her official capacity as a Tribal Legislator.

23.    Defendant Rebecca Brunette is a natural person residing in Wisconsin. She is a member of the Tribe's Legislature.   As a member of the Legislature, Defendant Brunette's duties include the chartering and oversight of the MITW Lending Entities.  In performing these duties, Defendant Brunette meets at least four times a year with other members of the Legislature to review, perform, and implement high-level management of the MITW Lending Entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the MITW Lending Entities; and approval of agreements between each entity and nontribal coconspirators.  Plaintiff seeks monetary damages against Defendant Brunette only in her individual capacity, while seeking injunctive and declaratory relief against her in her official capacity as a Tribal Legislator.

24.    Defendant Crystal Chapman-Chevalier is a natural person residing in Wisconsin.  She is the chief executive officer of Wolf River.  In this role, she directs

and controls Wolf River's operations, including the operation of Fineday and the Tribe's other lending portfolios.   Plaintiff seeks monetary damages against Defendant Chapman-Chevalier only in her individual capacity, while seeking injunctive and declaratory relief against her in her official capacity as CEO of Wolf River.

25.     The John Doe Defendants Nos. 1-15 are the as-yet unknown individuals and business organizations that designed, are operating, and have extracted most of the revenue from the Fineday enterprise.  Their identity, which has been hidden as a key part of the underlying scheme, will be easily established in this litigation.

## FACTUAL ALLEGATIONS

### A.     Ms. Matthews' Loan Violated Georgia Usury and Licensing Laws.

26.     Usury laws prohibit lenders from charging borrowers excessively high rates of interest on loans.  These laws have ancient origins, as usury prohibitions have been part of every major religious tradition.  As Pope Francis has put it: "Usury humiliates and kills. Usury is a grave sin. It kills life, stomps on human dignity, promotes corruption, and sets up obstacles to the common good."[2]

---

[2] *See* Pope Francis: "Usury humiliates and kills," Vatican News (Feb. 3, 2018), https://www.vaticannews.va/en/pope/news/2018-02/pope-francis-usury-financial-exploitation.html

27.    In the United States, that "[u]sury legislation to cap interest rates on loans predates the founding of our country."[3]  *See Payday Today, Inc. v. Defreeuw*, 903 N.E.2d 1057, 1060 (Ind. Ct. App. 2009) (citing Peterson, *supra* n. 3, 92 Minn. L. Rev. at 1116 n.13).  In addition to general usury laws, most states have adopted small-loan statutes that allow specifically defined, small-amount loans at higher rates, conditioned on the lender obtaining a license and complying with the restrictions contained in the statute.

28.    Typically, state usury laws involve: (1) an interest cap; and/or (2) a licensing requirement for lenders.  Almost every state in the country has enacted one or both of these requirements, including Georgia, where Plaintiff resides and from which she applied for, received, and made payments on her loan.

29.    Short-term loans of $3,000 or less fall under the Georgia Industrial Loan Act, Ga. Code §§ 7-3-1, *et seq.*

30.    The purpose of the Georgia Industrial Loan Act is "to define and prevent usury."  *Georgia Cash Am., Inc. v. Greene*, 734 S.E. 2d 67, 71 (Ga. 2012).

---

[3] *See* Christopher L. Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minn. L. Rev. 1110, 1117 (2008).

31.     Unless expressly exempted by the terms of the Act, a lender must obtain a license from the Industrial Loan Commissioner to make loans of $3,000 or less at an interest rate exceeding 8%.  Ga. Code Ann. §§ 7-3-5, 7-3-6, 7-3-8.

32.     Pursuant to Georgia Code § 7-3-29(a), "[a]ny person who shall make loans under [the Industrial Loan Act] without first obtaining a license . . . shall be guilty of a misdemeanor; and any contract made under [the Act] by such person shall be null and void."

33.     Georgia's Payday Lending Act also prohibits lenders from making loans of $3,000 or less at an interest rate exceeding 8% unless licensed to make such loans under the Industrial Loan Act or other laws regulating financial institutions. *See* Ga. Code Ann. §§ 16-17-1, *et seq.*

34.     A lender who violates the Payday Lending Act "shall be guilty of a misdemeanor of a high and aggravated nature and upon conviction thereof shall be punished by imprisonment for not more than one year or by a fine not to exceed $5,000.00 or both."  Ga. Code Ann. § 16-17-2(d).

35.     The Payday Lending Act further bars any lender of an unlawful loan from collecting any indebtedness and declares the loan "void ab initio."  Ga. Code Ann. § 16-17-3.

36.     Notwithstanding this statutory regime, Plaintiff was encumbered with an unlicensed loan with an interest rate grossly exceeding Georgia's 8% rate cap that originated from the usury lending scheme alleged herein.

37.     On or about December 28, 2023, while in Georgia, Ms. Matthews applied for a $1,400 loan, via the internet, from Fineday Funds, which was for her personal use.  After entering her personal information on the website, including her Social Security number and bank account information, she was approved for the loan nearly instantaneously.

38.     The loan agreement generated from the information she entered provided for a repayment sum of more than $6,700, payable in eighteen bi-weekly payments of $375.03, representing an Annual Percentage Rate of 617.862%.  A copy of the loan agreement is attached as Exhibit 3.

39.     According to this form loan agreement, Fineday is "an economic development arm of, an instrumentality of, and a limited liability company wholly-owned and controlled by, the Menominee Indian Tribe of Wisconsin ('Tribe')."  Ex. 3 at 2.

40.     The agreement further provides that it "is governed by the laws of the Tribe," *id.*, and that "Tribal law and applicable federal law shall exclusively apply" to any disputes, *id.* at 10.  The agreement thus purports to prohibit consumers from

16

ever invoking any possible defenses to enforcement of the agreement under state law, including, in this case, the law of Georgia, where Ms. Matthews resides.

41.    Fineday deposited the $1,400 principal amount electronically in Ms. Matthews' bank account based in Georgia, and soon thereafter, the bi-weekly payments were electronically debited from her account.  Over time, until she revoked her authorization for these automatic payments, she paid back more than the $1,400 she borrowed.

42.    Ms. Matthews' loan violated Georgia law in two fundamental respects: (1) Fineday made the loan without a license required by the Industrial Loan Act and the Payday Lending Act; and (2) the loan included an interest rate that grossly exceeded the 8% rate cap under both the Industrial Loan Act and the Payday Lending Act.

43.    The making of and collecting on Ms. Matthews' loan constituted a criminal violation under both Acts.  Ga. Code Ann. §§ 7-3-29(a), 16-17-2(d).

44.    Because Fineday, with the active participation and under the direction and control of the other Defendants, made the loan to Ms. Matthews in violation of the applicable licensing requirements, Ms. Matthews' loan is void, and she was never obligated to pay any amount on the invalid loan.  *See* Ga. Code Ann. §§ 7-3-29(a), 16-17-2(d).

45.     Further, Georgia law entitles Plaintiff to recover "three times the amount of any interest or other charges to the borrower."  Ga. Code Ann. § 16-17-3.

**B.      Fineday Issues Loans throughout the United States, in violation of Laws similar to those in Georgia.**

46.     As in Georgia, most other states and the District of Columbia recognize a similar public policy against usury and have adopted similar laws addressing high-interest loans.[4]  These laws are vital public policy tools that state legislatures use to

---

[4] Those states include Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming. See Ala. Code § 5-18-4 (loans made without a license "shall be void"); Alaska Stat. § 06.20.310; Ariz. Rev. Stat. § 6-613(B) (loans that charge illegal finance charges are "voidable"); Ark. Code §§ 4-57-104, 105; Cal. Fin. Code §§ 22303, 22750; Colo. Rev. Stat. Ann. § 5-2-201; Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); D.C. Code §§ 26-905, 28-3303; Fla. Stat. § 516.02 (loans made with excessive interest rates are "not enforceable"); Ga. Code § 16-17-3 (loans made without a license "shall be void ab initio"); Haw. Rev. Stat. § 478-4; Idaho Code § 28-46-402 (payday loans made without a license are "void, uncollectable and unenforceable"); 815 Ill. Comp. Stat. 122/4-10 (payday loans made without a license "shall be null and void"); Ind. Code Ann. § 24-4.5-5-202 (loans made without the proper authority are "void and the debtor is not obligated to pay either the principal or loan finance charge"); Kan. Stat. § 16a-5-201; Ky. Rev. Stat. Ann. § 286.4-991 (loans made without a license are void); La. Stat. Ann. § 9:3552; Me. Rev. Stat. tit. 9-A, § 2-401; Mass. Gen. Laws Ann. ch. 140, § 110 (small loans made without a

protect consumers in their states from the predatory conduct of high-APR, small-loan lenders.

47.     Despite the nearly universal prohibition against unlicensed, high-rate, small-loan lending, Fineday loans have been and continue to be made throughout the United States.  Upon information and belief, tens of thousands of consumers have become indebted to Fineday on terms like Plaintiff's loan.

---

license are void);  Md. Code, Com. Law § 12-314 (small loans made without a license that charge excessive interest rates are "unenforceable"); Mich. Comp. Laws §§ 438.32, 445.1854; Minn. Stat. §§ 47.60, 47.601 (provisions in loan contracts charging excessive interest rates are void and unenforceable); Minn. Stat. Ann. § 56.19 (authorizing debtor to recover all amounts paid on loans made in violation of licensing requirements); Miss. Code. § 75-67-119; Mont. Code § 31-1-712 (Any deferred deposit loan made by an unlicensed lender "is void, and the unlicensed person may not directly or indirectly collect, receive, or retain any loan principal, interest, fees, or other charges related to the loan"); Neb. Rev. Stat. § 45-1024; N.H. Rev. Stat. Ann. § 399-A:23 (any contract for small loan by unlicensed lender is "null and void"); N.M. Stat. Ann. § 58-15-3 (small loans made without a license are void); N.Y. Gen. Oblig. Law § 5-511 (usurious loans are "void"); N.Y. Banking Law § 355; N.C. Gen. Stat. Ann. § 53-166 (small loans made without a license are void); N.D. Cent. Code § 13-04.1-09.3 (West); Ohio Rev. Code Ann. § 1321.02 (small loans made without a license are void); Okla. Stat. tit. 14A, § 3-201; Or. Rev. Stat. § 725.045 (consumer finance loans made without a license are "void"); 41 P.S. §§ 501-502; 6 R.I. Gen. Laws Ann. § 6-26-4 (loans charging excessive interest "shall be usurious and void"); S.C. Code § 34-29-140; S.D. Codified Laws § 54-4-44 (loans charging excessive interest or made without a license are "void and uncollectible"); Tenn. Code §§ 47-14-110, 117; Tx. Fin. §§ 302.001-004; Vt. Stat. tit. 9, § 50; Va. Code § 6.2-1541(any loan made in violation of Virginia's usury and licensing laws "shall be void" and "any principal or interest paid on the loan shall be recoverable by the person by or for whom payment was made"); Wash. Rev. Code § 19.52.020; W. Va. Code §§ 46A-5-101; Wis. Stat. § 138.14; Wyo. Stat. § 40-14-521.

**C.**    **Fineday Loans are Examples of a "Tribal" Form of Payday Lending Schemes used by Bad Actors to Evade State and Federal Consumer Protections.**

48.    Despite the multitude of state and federal protections to prevent usurious lending, the profits to be realized by making small, high-interest loans are so high that some dishonest actors—aided by lawyers willing to help them create complex lending structures that conceal their involvement—are willing to accept the significant risk of litigation and liability for engaging in this criminal activity.

49.    Over the years, payday lenders have used various schemes to evade applicable state and federal protections.  In one of these schemes, known colloquially as a "rent-a-bank" strategy, payday lenders would try to exploit banks' unique, federally granted power to make loans exceeding state usury rates.   Under arrangements made with a willing bank, the payday lender would market, fund and collect loans nominally made by a bank that, for its part, earned fess without assuming much, if any, financial risk for the lending.

50.    Because banks are insulated from state examination and regulation by virtue of federal bank preemption doctrines, many payday lenders were, for a period of time, able to operate openly from storefronts, using these "rent-a-bank" arrangements to evade enforcement in states where, like Georgia, payday lending is illegal.  However, beginning in 2005, the Federal Deposit and Insurance Corporation

began to limit its regulated banks with regard to such "rent-a-bank" arrangements with payday lenders. *See* FDIC, Guidelines for Payday Lending, FIL-14-2005; *also see* Michael A. Stegman, *Payday Lending*, 21 *Journal of Economic Perspectives* 169, 178-79 (2007) (describing rent-a-bank scheme and regulatory reaction).

51.    As this and other regulatory pressure began to reduce the prevalence of rent-a-bank evasions,[5] the shadow payday loan industry turned to Native American tribes to replace the banks as the nominal lender behind their schemes, trying to take advantage of tribal insulation from state regulatory powers.

52.    Under this new "rent-a-tribe" model, the leadership of some economically impoverished tribes would agree to play a figurehead, nominal lender role and accept the revenue and call-center jobs offered. In return, they would also agree to conceal the identity of the non-tribal actors who would operate the enterprise and extract most of the profits, by participating in a ruse that disguises the business as one managed by and for the sole benefit of the tribe.[6]

---

[5] The United States Department of Justice also began cracking down on "rent-a-bank" schemes through an initiative that targeted financial intermediaries such as banks that rented their names to payday lending schemes and other financial scams. *See* Jessica Silver-Greenberg, Justice Department Inquiry Takes Aim at Banks' Business With Payday Lenders, N.Y. TIMES (Jan. 26, 2014).

[6] The use by payday lenders of tribal veneers as an artifice to evade state law has been widely publicized. *See, e.g.*, H.R., Committee on Financial Services, Dem. Staff Report, "Skirting the Law: Five Tactics Payday Lenders Use to Evade State

53.     To further advance the pretense of tribal initiative and control, and to protect the non-tribal principals from liability for their illegal conduct, various strategies are typically employed to keep the focus on the tribes and deter consumers from enforcing their rights.  Such measures include the adoption of tribal codes and regulations, and sometimes a tribal dispute resolution procedure, used to create the pretense of a legal infrastructure independent from state and federal law.

54.     Another central feature of the tribal business model is found in the loan agreements consumers are required to execute as a condition of receiving the unlawful, usurious loans.  The loan agreements are typically structured to include a waiver of all state and/or federal rights, in favor of tribal law and dispute resolution provisions.  That way, the non-tribal principals running the scheme can claim that they have no liability for their violations of state and federal laws because the loan agreements waive the application of all such law.

55.     In this case, for example, Fineday's loan agreements do not simply select the law of the Tribe to govern them, but expressly exclude the application of

---

Consumer Protection Law," June 16, 2016, at 15 ("Renting Sovereign Immunity"); Carter Dougherty, "Payday Lenders and Indians Evading Laws Draw Scrutiny," Bloomberg, June 5, 2012; Jeff Guo, "Many States Have Cracked Down on Payday Loans. Here's How Lenders Still Get Away with It," Washington Post, February 9, 2015.

any state laws, including state laws that would potentially allow a consumer to invalidate the loan agreements or choice-of-law provisions in the first place.

56.    It is therefore no wonder that strict enforcement of agreements like the one here would often leads to unfair results, including the waiver of all state and/or federal rights and the inability of consumers to pursue any redress for the predatory lender's illegal conduct.  Not surprisingly, these waivers have been repeatedly invalidated by courts across the country.[7]

57.    During the last decade, federal and state law enforcement agencies have taken various actions to combat tribal lending schemes, including by example:

    a.    In 2017, the Justice Department obtained highly publicized criminal convictions under RICO against payday loan kingpins and their attorneys, who had used "rent-a-tribe" arrangements to attempt to evade state usury law. *See United States v. Tucker*, No. 1:16-cr-00091-PKC (S.D.N.Y) (October,

---

[7] *See Hengle v. Treppa*, No. 20-1062 (4th Cir. Nov. 16, 2021); *Gibbs v. Stinson*, No. 3:18CV676, 2019 WL 4752792, at *14-18 (E.D. Va. Sept. 30, 2019); *see also Gingras v. Think Finance*, 922 F.3d 112 (2d Cir. 2019); *Brice v. 7HBF No. 2, Ltd.*, No. 19-CV-01481-WHO, 2019 WL 5684529 (N.D. Cal. Nov. 1, 2019); *Brice v. Plain Green*, 372 F. Supp. 3d 955 (N.D. Cal. 2019); *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *7 (C.D. Cal. Aug. 31, 2016); *W. Sky Fin., LLC v. State ex rel. Olens*, 300 Ga. 340, 348 (2016), *reconsideration denied* (Dec. 8, 2016); *Inetianbor v. CashCall, Inc.*, No. 13-60066-CIV, 2015 WL 11438192, at *3 (S.D. Fla. Dec. 8, 2015); *Cooper v. W. Sky Fin., LLC*, No. 13 CVS 16487, 2015 WL 5091229, at *10 (N.C. Super. Aug. 27, 2015); *MacDonald v. CashCall, Inc.*, No. CV 16-2781, 2017 WL 1536427, at *10 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 336 (4th Cir. 2017); *Hayes v. Delbert Services Corp.*, 811 F.3d 666, 675 (4th Cir. 2016); *Rideout v. CashCall, Inc.*, No.  2018 WL 1220565, at *8 (D. Nev. Mar. 8, 2018).

2017 of Scott Tucker and his attorney, Timothy Muir, on all fourteen felony counts brought against them);[8] *United States v. Hallinan*, No. 2:16-cr-00130-ER (E.D.Pa.) (November, 2017 conviction of Charles M. Hallinan and his attorney, Wheeler K. Neff, on seventeen felony counts).[9]

b.      The Consumer Financial Protection Bureau and state attorney general offices have filed civil actions against lenders using tribal lending models. *See, e.g., Consumer Fin. Prot. Bureau v. Great Plains Lending, LLC*, 846 F.3d 1049 (9th Cir. 2017) (affirming power of CFPB to investigate tribal lending arrangements), *cert. denied*, 138 S.Ct. 555 (2017); *Commonwealth of Pennsylvania v. Think Fin., Inc*., No. 14-CV-7139, 2016 WL 183289, at *1 (E.D. Pa. Jan. 14, 2016) (denying motion to dismiss state attorney general action under state RICO statute).

58.     The Fineday lending enterprise is just another example of a rent-a-tribe scheme designed to circumvent state usury regulation while taking advantage of vulnerable consumers who are in such dire circumstances that they are willing to accept triple-digit interest rates on relatively small sums just to pay their bills.

59.     For several years, the Tribe has been openly inviting and accepting rent-a-tribe partnerships with the shadow payday loan industry, using as a vehicle for

---

[8] *See* Press Release, United States Department of Justice, Scott Tucker and Timothy Muir Convicted at Trial for $3.5 Billion Unlawful Internet Payday Lending Enterprise (Oct. 13, 2017) (https://www.justice.gov/usao-sdny/pr/scott-tucker-and-timothy-muir-convicted-trial35-billion-unlawful-internet-payday).

[9] *See* Press Release, United States Department of Justice, Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case (Nov. 27, 2017) (https://www.justice.gov/usao-edpa/pr/two-men-found-guilty-racketeering-conspiracy-paydaylending-case).

these arrangements its limited liability company, Wolf River, and Wolf River's subsidiaries, including Fineday.

60.     The Tribe has neither the financial resources, the expertise, nor the technology needed to operate a national, multi-million-dollar lending enterprise.

61.     The Tribe's website indicates that the Tribe owns and operates several lending entities under the direction of Wolf River, including Fineday, Five Clans, and Four Directions.  Upon information and belief, despite these portfolios being worth tens of millions of dollars, only a small portion of the profits from the lending business benefits the Tribe.

62.     For example, despite the apparent value of the tribal lending business that claims to be wholly owned and operated by the Tribe, Wolf River's own website does not identify the lending businesses as part of its portfolio of companies.[10]

63.     The Tribe's 2023 Annual Report also identified several "priority areas as key to economic resiliency for our community," none of which included its lending operations.  *See* Exhibit 4 at 7.  And the Tribe's 2023 budget identifies only $536,778 in revenue from Wolf River as of the date of the report, with no other specific revenue line for its lending businesses, while its total revenues were over $9

---

[10] Wolf River Development Company, https://www.wolfriverdevelopment.com/.

million as of the report date.  *See id.* at 169.  Additionally, other annual reports show revenues of only $0 (2020) and $61,819 (2022) from Wolf River in recent years.[11]

64.     Upon information and belief, instead of receiving meaningful benefits from the lending operation, the Tribe sanctions the operations of Fineday, Five Clans, and Four Directions and its other lending businesses on behalf of nontribal participants who design and direct the tribal lending scheme that charges unconscionable interest rates in violation of state usury and licensing laws.  These unidentified defendants are the primary recipients of the revenues from the lending operation and provide the funds for the loans issued to Plaintiff and other consumers.

65.     To engage in this extremely profitable, but illegal business, the deliberately hidden, nontribal principals have entered into agreements with the Tribe, Defendants, Fineday, Five Clans, Four Directions, Wolf River, and others to make and collect on usurious loans in states across the country, including in Georgia, and to keep their identity hidden from consumers and regulators.

66.     Upon information and belief, each Defendant is aware of the numerous legal challenges to the tribal lending model and the illegality of making and collecting on usurious and void loans in other jurisdictions.

---

[11] The 2021 Annual Report did not include financial statements due delays from the COVID-19 pandemic.

67.    Indeed, Fineday's website states that it no longer offers loans in several jurisdictions, each of which correlate with jurisdictions in which courts have found similar lending practices unlawful.[12]

68.    Additionally, each of Defendants is aware that many consumers have complained about the abusive lending practices used by Fineday and other MITW Lending Enterprises.

69.    For example, Defendants have responded to numerous consumer complaints on Fineday's Better Business Bureau ("BBB") profile.  In fact, the BBB has refused to accredit Fineday due to the number of complaints (77) filed during the company's short time in business (2 years).

70.    Many of these complaints have cited Fineday's practice of charging high-interest, triple-digit interest rates on small-dollar loans like Plaintiff's, and even changing the interest rates after the loans were issued.

71.    Despite their awareness of their unlawful and unethical lending practices, Defendants continue to oversee and operate Fineday, Five Clans, and Four

---

[12] *See* Fineday Funds, https://finedayfunds.com/ (footer) (stating "Fineday Funds does not lend to residents of AR, CT, DC, IL, MA, ME, NM, NC, MD, NY, PA, SC, VA, VT, WI, and WV (MA, NM, NC, SC, MD Exemption: Returning Customers)").

Directions to facilitate the issuance of high-interest, triple-digit loans that violate usury laws across the country.

72.    Upon information and belief, Fineday, Wolf River, Five Clans, Four Directions and the other MITW Lending Entities operate under the oversight and management of the Tribal Legislature Defendants, Defendant Chapman-Chevalier, and the unidentified John Doe Defendants.

73.    The Tribal Legislature Defendants continue to facilitate the illegal lending scheme by allowing Fineday, Five Clans, Four Directions and the other MITW Lending Entities to make and collect on usurious and void loans in multiple jurisdictions, including Georgia.

74.    Upon information and belief, none of the Defendants have applied for a consumer lending license in Georgia or in other states with similar licensing laws.

75.    Upon information and belief, a significant portion of the lending operations done under the name Fineday and the other MITW Lending Entities are operated by third parties that are not located on tribal lands, who, along with the Board of Directors of Wolf River, comprise the unnamed John Doe Defendants. These non-tribal outsiders supply all the lending capital and handle and control all or part of the marketing, underwriting, funding, risk assessment, compliance, customer complaints, accounting, lead generation, collections, and website

management for the business.  Upon information and belief, nontribal outsiders exert significant control over all or a portion of these activities regardless of the location where these activities occur.

76.     Fineday's website includes the following disclaimer:

> Eagle Lending, LLC dba Fineday Funds is a commercial enterprise and instrumentality of the Menominee Indian Tribe of Wisconsin, a federally recognized sovereign Indian nation (the "Tribe"), which abides by the principles of federal consumer finance laws, as incorporated by the Tribe, and operates within the interior boundaries of the Menominee Indian Reservation, WI. Eagle Lending, LLC dba Fineday Funds is chartered under and operates pursuant to Tribal law.

77.     The Tribe's Code also purports to establish a "Tribal Consumer Financial Services Regulatory Authority" (the "Authority") for the licensure and regulation of each tribal lending entity, including Fineday.  Ex. 2 § 22-4.

78.     Despite these representations, Plaintiff is unable to locate any information regarding Fineday's operations within the Tribe's reservation or the existence of a Tribal Consumer Financial Regulatory Authority.  The Tribe's 2023 Annual Report makes no mention of Fineday or any other lending entities, for that matter.  Ex. 4.  Nor does it identify any members or actions by the Authority in the past year.  Ex. 4 at 143.  In fact, the most recent report that identified any action by the Authority was the 2020 Annual Report, which simply stated that the Authority (whose members were again unidentified) had issued several licenses.  Plaintiff

could not identify any evidence that the Authority has taken any regulatory actions with respect to the MITW Lending Entities.  Based on this information, the Authority is in fact illusory and has no active members.

79.   Defendants' attempts to evade state usury protections also extend to the form Fineday consumer loan agreements, which prospectively waive the application of all state laws, including those that could challenge the application of the Tribe's laws under the choice-of-law provision, stating, *inter alia*, that "Tribal law and applicable federal law shall exclusively apply" to all disputes.

80.   As such, the form agreements purport to strip consumers like Plaintiff of the right to challenge the application of the Tribe's laws to their loans under the public policy and laws of their own states of residence, including Georgia, which have a long and robust history of precluding usurious lending operations like Fineday's that burden their citizens with insurmountable debts.

81.   Further, the consumer loan agreement includes a mandatory "dispute resolution procedure" available to a consumer for any claims.

82.   Notably, while claiming to be "an accommodation to consumers," this dispute resolution procedure only applies to a consumer's complaint, and Fineday is not restricted in the manner of enforcement of the agreement against a consumer.

83.    In addition to only applying to consumer's claims, the dispute resolution procedure requires consumers to first file complaints with Fineday for an investigation and response.

84.    If a consumer is unhappy with the result of Fineday's investigation, a consumer can then pursue arbitration, but the arbitrator can apply only the laws of the Tribe and "applicable federal law."   The arbitrator could not consider any possible state law defenses to enforcement of the loan agreement, including that the agreement's selection of tribal law to the exclusion of Georgia law violates the state's public policy against unlicensed usurious lending.   As such, the agreement prospectively waives any right of consumers like Plaintiff and others in states with usury regulations to challenge the choice-of-law provision that exclusively selects the law of the Tribe.

85.    Similarly, while the agreement purports to require arbitration of "all… state law claims," it precludes arbitrators from ever applying the law of any state to determine those claims, including in instances where the law of the state applies regardless of any choice of law provision.   And in the same vein, it also precludes the application of any state defenses to arbitrability, as those would necessarily require the application of state law that the agreement expressly prohibits.   As such, the arbitration provision in the form agreement is wholly unenforceable.

## **CLASS ACTION ALLEGATIONS UNDER RULE 23**

86.    Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to Federal Rules of Civil Procedure Rule 23(a), (b)(2), and (b)(3), as a representative and member of the following Classes:

a.  First, all persons who obtained Fineday, Five Clans, Four Directions, or any other MITW Lending Entity loans from the beginning of the period commencing four years prior to the filing of this action, who, at the time the loan was made, were residents of any states other than Nevada or Utah, and who made payments on such loans in an amount in excess of the amount of loan proceeds they received ("the RICO Class");

b.  Second, all persons who were living in Georgia at the time they entered into Fineday, Five Clans, Four Directions, or any other MITW Lending Entity loan agreements, and who made payments on such loans in an amount in excess of the amount of loan proceeds they received ("the Georgia RICO Damages Class"); and

c.  Third, all persons who were living in Georgia at the time they entered into Fineday, Five Clans, Four Directions, or any other MITW Lending Entity loan agreements ("the Georgia Usury Class").

87.    The identity and of the members of the above Classes will be easily ascertainable from the records of Defendants.

88.    **Numerosity. Fed. R. Civ. P 23(a)(1).**  Currently, Plaintiff does not know the exact number of members of each Class.  However, based on the class sizes in similar cases, Plaintiff anticipates that there are likely thousands of members. Thus, the Classes are so numerous that joinder of all members is impracticable.

89.    **Typicality. Fed. R. Civ. P. 23(a)(3).**  Plaintiff's claims are typical of the claims of each putative class member.  In addition, Plaintiff is entitled to relief under the same causes of action as the other members of the putative Classes.  All are based on the same facts and legal theories.

90.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate representative of the Classes because her interests coincide with, and are not antagonistic to, the interests of the members of each Class; she has retained counsel competent and experienced in such litigation; and she has prosecuted, and intends to continue to prosecute, this action vigorously.  Plaintiff and her counsel will fairly and adequately protect the interests of the members of each Class.  Neither Plaintiff nor her counsel have any interests which might cause them not to vigorously pursue this action.

91.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2) and 23(b)(3).**  Common questions of law and fact exist as to all members of each Class, and there are no factual or legal issues that differ between the putative class members.  These questions will predominate over the questions affecting only individual class members.  The common questions include: (1) whether the form loan agreements contain invalid and unenforceable choice-of-law and mandatory dispute resolution provisions; (2) the facts surrounding the organization, structure

and funding of the underlying enterprise, including with regard to control over the business and the performance of the various lender functions, as well as the flow of lending capital and revenue; (3) the nature and extent of Defendants' knowledge and participation in the affairs of the enterprise; (4) whether the loans are "unlawful debt" for purposes of RICO; (5) whether the loans are unlawful payday loans under Georgia RICO and/or the Industrial Loan Act or Payday Lending Act; (6) whether Defendants violated RICO and/or Georgia RICO by collecting on the loans; and (7) what is the proper recovery for Plaintiff and the class members against Defendants.

92.     **Superiority. Fed. R. Civ. P. 23(b)(3).**   Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy.  The damages sought by each member are such that individual prosecution would prove burdensome and expensive.  It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them.  Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct.

By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

93.     **Injunctive and Declaratory Relief**. **Fed. R. Civ. P. 23(b)(2).** Defendants have acted or refused to act on grounds that apply generally to the class, rendering injunctive and declaratory relief appropriate respecting the class as a whole.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violation of RICO, 18 U.S.C. § 1962(c)
### (RICO CLASS CLAIM AGAINST ALL DEFENDANTS
### IN THEIR INDIVIDUAL CAPACITIES ONLY)

94.     Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

95.     Defendants are each a "person" as that term is defined in 18 U.S.C. § 1964(3), and are being sued in their individual capacities with regard to their own individual conduct.

96.     Defendants, along with the Tribe and others, were and continue to be members and associates of an internet lending association-in-fact that will be referred to hereafter as the "Usurious Lending Organization" or "the Enterprise."

97.   The Usurious Lending Organization, including its leadership, membership, and associates, constitutes an "enterprise" as that term is defined in 18 U.S.C. § 1961(4)—that is, a group of individuals and entities associated in fact.

98.   The members and associates of the Usurious Lending Organization shared various common purposes, including the evasion of state usury and licensing law, the operation of the "Fineday Funds" website, the processing of applications from consumers across the United States, the collection of payments from borrowers, and the division of generated revenues in accordance with written agreements.

99.   The Usurious Lending Organization assigned specific roles to the members and associates. The John Doe Defendants designed and directed the Organization and distributed the revenues generated in accordance with the said written agreements.  The role of the named Defendants was primarily to establish and organize the tribal façade for the Organization and to take various measures designed to reinforce the fiction that the Organization is a tribal-run business.

100.  The Usurious Lending Organization has had a longevity sufficient to originate and collect tens of thousands of illicit loans.

101.  The Usurious Lending Organization has been engaged in, and its activities affected, interstate commerce.  The named Defendants perform their roles

from the tribal lands in Wisconsin but the John Doe non-tribal Defendants who are operating the Organization do so, upon information and belief, from locations in other states.  The Organization sends loan proceeds into and collects payments from locations throughout the United States.

102.   RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate."  18 U.S.C. § 1961(6).

103.   Defendants violated § 1962(c) of RICO, 18 U.S.C. § 1962(c), by participating, directly or indirectly, in the conduct of the Enterprise's affairs in the collection of unlawful debt.

104.   All of the loans made to Class members and collected by Defendants and Defendants' co-conspirators included interest rates far in excess of twice the enforceable rate in their states.

105.   As alleged, each of Defendants participated in the collection of unlawful debt.

106.   Plaintiff and the RICO Class members were injured as a direct result of Defendants' violations of 18 U.S.C. § 1962(c) by, among other things, the payment

of unlawful debt to the Enterprise, which money transfers would not have been made but for Defendants' conduct.

107.   Accordingly, Defendants are jointly and severally liable in their individual capacities to Plaintiff and the RICO Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**SECOND CAUSE OF ACTION**
**Violation of RICO, 18 U.S.C. § 1962(d)**
**(RICO CLASS CLAIM AGAINST ALL DEFENDANTS IN THEIR**
**INDIVIDUAL CAPACITIES ONLY)**

108.   Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

109.   Defendants violated § 1962(d) of RICO, 18 U.S.C. § 1962(d), by conspiring to violate § 1962(c).

110.   Defendants each knowingly agreed to participate in the scheme alleged herein that allowed the Enterprise to make and collect unlawful debt at more than twice the lawful rate of interest under state usury laws.

111.   Plaintiff and the RICO Class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(d) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the enterprise.

112.    Defendants are jointly and severally liable in their individual capacities to Plaintiff and the RICO Class for actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**THIRD CAUSE OF ACTION**
**Violation of Georgia RICO, Ga. Code Ann. §§ 16-14-4(a), 16-14-6**
**(GEORGIA RICO DAMAGES CLASS CLAIM AGAINST ALL**
**DEFENDANTS IN THEIR INDIVIDUAL CAPACITY ONLY AND**
**GEORGIA USURY CLASS CLAIM FOR INJUNCTIVE RELIEF AGAINST**
**ALL DEFENDANTS IN THEIR OFFICIAL CAPACITIES)**

113.    Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

114.    Defendants are each a "person" under Georgia RICO and are being sued in their individual capacities with regard to their own individual conduct and in their official capacities with regard to the injunctive relief sought under the Georgia RICO Act.

115.    Each Defendant individually and the Usurious Lending Organization collectively constitutes an "enterprise" as that term is defined in Ga. Code Ann. § 16-14-3(3), in that the term applies to a single person, as well as any "partnership . . . or other legal entity" or "group of individuals associated in fact."

116.    Defendants engaged in a "pattern of racketeering activity," as that term is defined in Ga. Code Ann. §§ 16-14-3(4) and 16-4-13(5)(A)(xxxvii), because they each committed, attempted to commit, and/or solicited others to commit at least two

acts of collection of unlawful payday loans in violation of Chapter 17 of Title 16 the Georgia Code, Ga. Code Ann. § 16-17-2(d).

117.   Through this pattern of racketeering activity, Defendants maintained, both directly and indirectly, an interest in and control over the Usurious Lending Organization, in violation of Ga. Code Ann. § 16-14-4(a).

118.   Plaintiff and the Georgia RICO Damages Class members were injured as a direct result of Defendants' violations of Ga. Code Ann. § 16-14-4(a) by, among other things, the payment of unlawful debt to the Enterprise, which money transfers would not have been made but for Defendants' conduct.

119.   Accordingly, Defendants are jointly and severally liable in their individual capacities to Plaintiff and the Georgia RICO Damages Class for their actual damages, treble damages, punitive damages, costs, and attorneys' fees pursuant to Ga. Code Ann. § 16-14-6(c).

120.   Plaintiff and the Georgia Usury Class have further been, and will continue to be, irreparably harmed by Defendants' violations of Georgia RICO § 16-14-4(a) such that they are entitled to injunctive relief under § 16-14-6(a)-(b) enjoining Defendants in their official capacities from, at a minimum, collecting on any unlawful loans issued to Plaintiff and the Georgia Usury Class or continuing to issue such loans in violation of Georgia RICO and the Payday Lending Act.

## FOURTH CAUSE OF ACTION
## Violation of Georgia RICO, Ga. Code Ann. §§ 16-14-4(b), 16-14-6
## (GEORGIA RICO DAMAGES CLASS CLAIM AGAINST ALL
## DEFENDANTS IN THEIR INDIVIDUAL CAPACITY ONLY AND
## GEORGIA USURY CLASS CLAIM FOR INJUNCTIVE RELIEF AGAINST
## ALL DEFENDANTS IN THEIR OFFICIAL CAPACITIES)

121.   Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

122.   As set forth above, Defendants have also participated in the Usurious Lending Organization through a pattern of racketeering activity in violation of Ga. Code Ann. § 16-14-4(b).

123.   Plaintiff and the Georgia RICO Damages Class members were injured as a direct result of Defendants' violations of Ga. Code Ann. § 16-14-4(b) by, among other things, the payment of unlawful debt to the Enterprise, which money transfers would not have been made but for Defendants' conduct.

124.   Accordingly, Defendants are jointly and severally liable in their individual capacities to Plaintiff and the Georgia RICO Damages Class for their actual damages, treble damages, punitive damages, costs, and attorneys' fees pursuant to Ga. Code Ann. § 16-14-6(c).

125.   Plaintiff and the Georgia Usury Class have further been, and will continue to be, irreparably harmed by Defendants' violations of Georgia RICO § 16-14-4(b) such that they are entitled to injunctive relief under § 16-14-6(a)-(b)

enjoining Defendants in their official capacities from, at a minimum, collecting on any unlawful loans issued to Plaintiff and the Georgia Usury Class or continuing to issue such loans in violation of Georgia RICO and the Payday Lending Act.

## FIFTH CAUSE OF ACTION
**Violation of Georgia RICO, Ga. Code Ann. §§ 16-14-4(c), 16-14-6**
**(GEORGIA RICO DAMAGES CLASS CLAIM AGAINST ALL DEFENDANTS IN THEIR INDIVIDUAL CAPACITY ONLY AND GEORGIA USURY CLASS CLAIM FOR INJUNCTIVE RELIEF AGAINST ALL DEFENDANTS IN THEIR OFFICIAL CAPACITIES)**

126.   Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

127.   As set forth above, Defendants have also conspired with themselves and others in the Usurious Lending Organization to violate Ga. Code Ann. §§ 16-14-4(a) and 16-14-4(b), and each has committed and continues to commit multiple overt acts in furtherance of the conspiracy (e.g., the issuance and collection of unlawful loans in Georgia; establishment of the MITW Lending Entities; and other actions to evade Georgia law), in violation of Ga. Code Ann. § 16-14-4(c).

128.   Defendants have also endeavored to violate Ga. Code Ann. §§ 16-14-4(a) and 16-14-4(b), and have committed and continue to commit multiple overt acts in furtherance of the objective of that endeavor (e.g., the issuance and collection of unlawful loans in Georgia; establishment of the MITW Lending Entities; and other actions to evade Georgia law), in violation of Ga. Code Ann. § 16-14-4(c).

129.   Plaintiff and the Georgia RICO Damages Class members were injured as a direct result of Defendants' violations of Ga. Code Ann. § 16-14-4(c) by, among other things, the payment of unlawful debt to the Enterprise, which money transfers would not have been made but for Defendants' conduct.

130.   Accordingly, Defendants are jointly and severally liable in their individual capacities to Plaintiff and the Georgia RICO Damages Class for their actual damages, treble damages, punitive damages, costs, and attorneys' fees pursuant to Ga. Code Ann. § 16-14-6(c).

131.   Plaintiff and the Georgia Usury Class have further been, and will continue to be, irreparably harmed by Defendants' violations of Georgia RICO § 16-14-4(c) such that they are entitled to injunctive relief under § 16-14-6(a)-(b) enjoining Defendants in their official capacities from, at a minimum, collecting on any unlawful loans issued to Plaintiff and the Georgia Usury Class or continuing to issue such loans in violation of Georgia RICO and the Payday Lending Act.

## SIXTH CAUSE OF ACTION
### Declaratory Judgment
### (GEORGIA USURY CLASS CLAIM AGAINST ALL DEFENDANTS)

132.   Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

133.   The Georgia Industrial Loan Act prohibits lenders without a license from the Industrial Loan Commissioner from issuing loans of less than $3,000.00 to Georgia consumers at an interest rate greater than 8 percent and declares any loans issued in violation of the Act null and void.  Ga. Code Ann. § 7-3-29(a).

134.   The Payday Lending Act likewise prohibits unlicensed lenders from issuing loans of less than $3,000.00 to Georgia consumers without a license under the Industrial Loan Act or other laws regulating financial institutions and declares any loans issued in violation of the Payday Lending Act "void ab initio."  Ga. Code Ann. § 16-17-3.

135.   Neither Defendants nor the MITW Lending Entities, nor any other coconspirators in the Usurious Lending Organization, obtained a license under the Industrial Loan Act or any other relevant provision of the Georgia Code.

136.   Despite their lack of a license, Defendants, through their control of the MITW Lending Entities, issued loans to Plaintiff and the Georgia Usury Class that had interest rates well above 8%.

137.   The loans issued to Plaintiff and the Georgia Usury Class are thus null and void.

138.   Plaintiff and members of the Georgia Usury Class are subject to ongoing harm absent a declaration that the loans were void, including the

accumulation of additional debt, adverse credit reporting of the invalid loans, and abusive collection practices.

139.   The dispute and controversy is a justiciable matter that is not speculative, and a resolution by this court will determine the rights and interests of the parties to the loan contracts as well as the validity, if any, of the choice of law and forum-selection provisions.

140.   Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the loan agreements.

141.   Accordingly, Plaintiff and the Georgia Usury Class seek a declaratory judgment against Defendants that the loans issued to them are invalid and uncollectable.  Plaintiff and the Georgia Usury Class also seek to enjoin Defendants, in their official capacities, from allowing collection on the loans.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants as follows:

A.     An Order certifying the proposed Classes under Fed. R. Civ. P. 23(b)(2) and/or (b)(3) and appointing Plaintiff as class representative and their counsel as class counsel, as soon as practicable;

45

B.   An Order declaring that the loan agreements are void and unenforceable;

C.   An Order awarding monetary damages against Defendants in their individual capacities, including but not limited to any compensatory, punitive, incidental, or consequential damages, as well as treble damages allowed under RICO and/or Georgia RICO, in an amount to be determined by the Court or jury;

D.   An Order awarding interest at the maximum allowable legal rate against Defendants, in their individual capacities on the foregoing sums;

E.   An Order awarding Plaintiff her reasonable costs and expenses of suit, including attorneys' fees, against Defendants in their individual capacities; and

F.   Such further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all matters so triable.

Respectfully submitted,
**PLAINTIFF**

By:   */s/ Matthew G. Rosendahl*

Matthew G. Rosendahl (Ga. Bar # 449311)
KELLY GUZZO, PLC

46

3925 Chain Bridge, Suite 202
Fairfax, VA  22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
Email: matt@kellyguzzo.com

*Counsel for Plaintiff*

## **CERTIFICATE OF COUNSEL**

I hereby certify that the foregoing document has been prepared with Times New Roman 14-point font, one of the fonts and point selections approved by the Court in LR 5.1, N.D. Ga.

*/s/ Matthew G. Rosendahl*